STATE OF LOUISIANA

VERSUS

LEONIDAS LOWRY AKA "CHICO"

NO. 23-KA-392

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 16-7077, DIVISION "D"
HONORABLE SCOTT U. SCHLEGEL, JUDGE PRESIDING

May 15, 2024

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Jude G. Gravois, and Stephen J. Windhorst

**AFFIRMED; REMANDED FOR CORRECTION OF UNIFORM**
**COMMITMENT ORDER AND SENTENCING MINUTE ENTRY**
    **JGG**
    **SMC**
    **SJW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Honorable Paul D. Connick, Jr.
     Thomas J. Butler
     Andrea F. Long
     Darren A. Allemand

COUNSEL FOR DEFENDANT/APPELLANT,
LEONIDAS LOWRY
     Bertha M. Hillman

**GRAVOIS, J.**

Defendant, Leonidas Lowry a/k/a "Chico," appeals his conviction and sentence for second degree murder. There is only one issue on appeal: Did the trial court err in denying defendant's motion to suppress evidence extracted from his cell phone? We conclude, based on a plain reading of La. C.Cr.P. art. 163, the pertinent statute, the trial court properly denied the motion to suppress the contents of the cell phone. We affirm defendant's conviction and sentence. We remand the matter for correction of the Uniform Commitment Order and the sentencing minute entry, as noted below in our Errors Patent Review.

## PROCEDURAL STATUS

In 2017, a Jefferson Parish Grand Jury indicted defendant, Leonidas Lowry a/k/a "Chico," with the second degree murder of Ethan Allen, in violation of La. R.S. 14:30.1. Defendant pled not guilty at his arraignment.

The bill of indictment also charged Steven R. Tate Jr., a/k/a "Bubba," with the second degree murder of Mr. Allen and with conspiracy to commit an armed robbery of Mr. Allen, along with defendant, "A.L.," and other persons, in violation of La. R.S. 14:26 and 14:64. In a separate trial, Tate was convicted of second degree murder. This Court upheld Tate's conviction. *See State v. Tate*, 22-570 (La. App. 5 Cir. 6/21/23), 368 So.3d 236. The State's theory of the case against defendant was that he was a principal with Steven Tate to second degree felony murder (armed robbery) of Mr. Allen.

In due course, defendant filed a motion to suppress the evidence extracted from his cell phone. After a hearing, the trial court denied the motion.

On March 23, 2022, a jury found defendant guilty as charged. The trial court sentenced defendant to life imprisonment without the benefit of probation or suspension of sentence.[1] In May 2023, the trial

---

[1] At the time of the offense, defendant was sixteen years old. He was indicted on March 30, 2017. Under La. C.Cr.P. art. 878.1(B)(1), if a juvenile offender was indicted for second degree murder prior to August 1, 2017, and a hearing to determine the juvenile offender's parole eligibility was not held before

court granted defendant an out-of-time appeal. On appeal, defendant argues the court erred in denying his motion to suppress extractions from his cell phone.

## FACTS ESTABLISHED AT TRIAL

During the evening of November 29, 2016, Gerald Katicich heard gunshots outside his home at 801 Gulf Drive in Gretna. Specifically, he heard a couple of shots from one gun, a slight pause, and then a return of gunfire from another gun. Mr. Katicich went outside and heard people across the street yelling: "He's been hit!" Mr. Katicich then observed a car swerving down the street. He got into his truck and followed the swerving car as he called 9-1-1. The car he was following eventually stopped against a traffic sign. As Mr. Katicich approached the car, Officer Corey Boudreaux with the Gretna Police Department arrived.

Officer Boudreaux saw the driver, later identified as Ethan Allen, gasping for air. Mr. Allen had a cell phone and cash on his lap. Officer Boudreaux placed the cell phone and cash on the dashboard and removed Mr. Allen from the car. Mr. Allen stopped breathing once he was removed from the car. Officer Boudreaux performed CPR on Mr. Allen as other officers arrived.

Dr. Dana Troxclair, a forensic pathologist, established that Mr. Allen died from a single gunshot wound that entered his right lateral chest and exited his back. She explained the lack of searing, soot, and stippling indicated it was a distant-range gunshot wound, which is "over two to three feet" from the firearm.

Casings and a gun were found in the back seat of the car. The rear passenger window was shattered and there was glass inside the car. No "weed" was found in the car.[2] A search warrant of the car

---

that date, the State was afforded the opportunity to file a notice of its intent to seek a sentence of life imprisonment without the possibility of parole within ninety days of August 1, 2017. *State v. Smith*, 18-131 (La. App. 5 Cir. 10/17/18), 258 So.3d 973, 977-78, *writ denied*, 18-1959 (La. 4/15/19), 267 So.3d 1123. The State did not file such a notice in the present case. Therefore, La. C.Cr.P. art. 878.1 requires that defendant "shall be eligible for parole pursuant to R.S. 15:574.4(E) without the need of a judicial determination … ." *See Smith*, *supra*.

[2] "Weed" is a commonly used slang term for marijuana.

was obtained and executed and the following items were recovered: a Smith and Wesson .40 caliber firearm, a projectile located in the passenger front door, and eight spent casings—seven from inside of the vehicle and one from underneath Mr. Allen. Mr. Allen's phone and $7 were also recovered in the vehicle, and $93 was found on Mr. Allen's person.

Kremly Marrero, who lived at 803 Gulf Drive, also heard gunfire—"Pom! Pom!" a pause, and then "Pom! Pom! Pom! Pom! Pom!"—around the same time Mr. Katicich did. Mr. Marrero went outside and saw a young man screaming that his friend had been shot. He ran across the street to 812 Gulf Drive and attended to a person, whom he described as being "hit everywhere." Defendant was also present at that time. The Gretna police arrived within minutes.

Officer Damond Bartlett with the Gretna Police Department approached the carport area of 812 Gulf Drive where Steven Tate (also called "Bubba"), who had been shot, was located. EMS took Tate to the hospital for multiple gunshot wounds. Evidence from the roadway where the incident occurred, including two .45 caliber shell casings, projectiles, and automotive glass, was collected. A .45 caliber Springfield Armory 1911 handgun was located in the back yard of 810 Gulf Drive, and a Sig Sauer 9 mm firearm was found on top of a utility shed in the rear of 812 Gulf Drive.

Authorities executed a search warrant of 812 Gulf Drive, defendant's residence, on the night of the incident. Two phones located on the sofa were recovered, as well as a 9 mm Taurus Millennium firearm found between the fitted sheet and mattress in defendant's bedroom.

That night, the Gretna Police Department took defendant to the police station where he gave two recorded statements to the police. Defendant's grandmother, Debra Lowry, was also present. After advising him of his *Miranda*[3] rights, Detective Ralph Dunn with the Gretna Police Department took defendant's first recorded statement.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Defendant told Detective Dunn that he and Tate were standing on his porch after walking outside to smoke a cigarette when Tate received a phone call. Defendant was texting while Tate walked up and down the driveway and sidewalk and talked on the phone. During this time, defendant's family and his friend, Treven Vinet, were inside. Defendant stated he saw a dark, grayish-blueish four-door SUV pass by and slow down by Tate in front of a neighbor's house. The front passenger window of the car rolled down and defendant heard at least six shots and saw a flame. He ran toward his porch, and as he looked back, he saw Tate coming towards him. Tate was screaming and told him to call an ambulance. Defendant and his grandmother called 9-1-1. When the detective asked who started shooting at the car, defendant said something indiscernible and then, "Bubba ain't start shooting at the car." Later in his statement, defendant stated he saw Tate return fire at the car. Defendant denied firing any weapons during the incident. Defendant also denied Tate was dealing "dope." Defendant acknowledged he knew Tate to carry a gun. Defendant said Tate had previously been charged with attempted murder and speculated this shooting was in retaliation.

Defendant stated he saw Tate and Treven with three guns that day and earlier he "played" with all three guns in his backyard. Tate had a black .45 with a wooden grip and the brand was "something armory," and Tate also had a black 9 mm Millennium. Treven had a black 9 mm Sig Sauer. Defendant thought the two guns found outside were placed there by Treven. He said Treven was asking for the guns and looking for them as defendant cared for Tate. Defendant also said Tate must have thrown his gun when he ran to the porch where he collapsed.

Detective Dunn obtained video surveillance from the Jefferson Parish Sheriff's Office ("JPSO") uniform shop located at the end of Gulf Drive where the victim, Mr. Allen, was located. He also obtained video from 1121 8th Street, which is in the area of 812 Gulf Drive where Tate was located. He explained the video showed two people exit the porch area of 812 Gulf Drive and approach the street prior to when the victim's Honda CRV approached down Gulf Drive.

A few minutes later, two people ran from the street back to the porch area of 812 Gulf Drive. Because defendant's statement, that he was under the carport when Tate ran back, did not match the video, Captain Jerry Broome interviewed defendant a second time that same night.

Captain Broome learned that defendant, his grandmother, his two sisters,[4] Tate, Treven, and Chris Cross were at the house on the day in question. Defendant told Detective Broome that Tate and Treven brought the three guns to the house and were showing him the guns in the back yard. After Chris arrived, they went inside and played video games. Shortly before the incident, Treven gave him the Millennium gun found in his bedroom. After defendant's sisters arrived, Tate called Mr. Allen. Mr. Allen went to his house because he was supposed to sell Tate "weed."

Defendant and Tate went outside to wait for Mr. Allen, the victim. Everyone else was inside. Defendant had the Millennium firearm with him and Tate had the Springfield .45 firearm on his person. Mr. Allen pulled up one house down. As defendant stood under the carport, Tate went to the car. Tate acted like he was going to get in the back passenger side, but then he closed the door and got in the front. As Tate exited the car, defendant heard shots. He thought Tate shot first and Tate was outside the car when he fired two or three times. The person inside the car returned fire. Defendant turned around to run inside, but Tate ran to him before he made it inside. At that point, Treven was outside trying to find Tate's gun. Defendant and his grandmother called the police, and as the police arrived, his grandmother told them they better not have any "weed" and to "throw that s***." Defendant denied getting rid of any "weed" or seeing any on Tate. Defendant saw Treven still had a gun and told him to put it away. Treven then "speedwalked" to the back yard. Defendant put the Millennium firearm under his mattress in his bedroom.

---

[4] The two sisters were identified at trial as Tatiana and Arianna.

Defendant stated the police would not find evidence from him which would show Tate planned to rob Mr. Allen. He stated Tate never mentioned a robbery that night and he did not know what caused the shooting. Defendant acknowledged Tate had robbed people before and the prior attempted murder charge was "supposed to be a robbery."

Subsequently, when defendant's grandmother, Ms. Lowry, was alone with him in the interview room, defendant used her phone to make a call. He asked to speak to Tatianna, his sister, and asked her if they had said anything about "robbing." She replied negatively. An officer entered the room and instructed defendant not to use the phone. After more time left alone during which defendant continued to use Ms. Lowry's phone, an officer took it away.

An iPhone found on the couch in the living room at 812 Gulf Drive belonged to defendant. He provided the police with the passcode to it. A Samsung Galaxy also found there belonged to Treven. Search warrants were obtained for both phones.

JPSO Sergeant Solomon Burke, an expert in mobile device forensics, performed cell phone extractions on three phones in this case and reviewed excerpts from his report. Regarding defendant's phone, two photographs were taken on November 29, 2016 (the day of the shooting) from 812 Gulf Drive showing firearms. On the same day, the number associated with defendant sent text messages that referenced a "million-dollar lick" and referenced being in possession of firearms. Sergeant Burke defined a "lick" as "slang for robbery." Additionally, on the day of the shooting, Sergeant Burke testified that the number associated with defendant sent the following message: "Bubba just came got a whole QP from me. In an hour he gonna [sic] bring a half pound back."

Sergeant Burke testified that prior to the date of the shooting, on October 23, 2016, there were messages from the number associated with defendant to a contact named "Bubba" which stated they were going to "jack" a man when they find out the location of his house. Sergeant Burke also testified that on November 23, 2016, a message was sent from "Ari" to defendant's phone number in which she asked

to use his "hammer" and said I need to "hit a lick." A message from defendant's number responded, stating: "Whatever lick it is, [wh]y don't you send it by me?" A message sent from defendant's number indicated he would not give his gun to Ari. A message sent from defendant's number asked how she was going to "jack him," and she replied: "You're not going to let me use your hammer though." A message sent from defendant's number then stated that he does not let Bubba hold his gun.

Further, the lead investigator, JPSO Lieutenant Brandon Leblanc, testified that texts from November 22, 2016 showed Arianna was asking for a gun to "hit a lick." Defendant responded he would not let her do it and would instead do it himself. Lieutenant Leblanc testified that a text sent from defendant's number to Arianna's number in the same conversation after she mentioned defendant was under house arrest stated: "What he got and I just jacked some the other day. I'm just telling him pull up next door."

Sergeant Ashton Gibbs received Mr. Allen's cell phone and obtained a search warrant for it. Prior to submitting Mr. Allen's phone to the crime lab, Sergeant Gibbs looked through it and determined that two phone numbers—one belonging to Tate and the number associated with Arianna—were communicating with Mr. Allen before his death. The sergeant did not recall seeing any communication between Mr. Allen and defendant.

At 4:03 p.m. on the day of the shooting, Mr. Allen's phone received a call and a text from the number associated with Arianna. The number associated with Arianna called Mr. Allen's number at 5:25 p.m. A message sent from Arianna's phone number to Mr. Allen's phone number on November 29, 2016 said: "805 gulf drive she said you coming rn [right now]??" At 5:28 p.m., a message was sent from Arianna's phone number that said: "She's on her house arrest. Her [brother's] number ***-1266." Additionally, a message sent from Arianna's phone number to Mr. Allen's phone stated that her brother was going to come to the car or he had to go to the door.

Sergeant Burke acknowledged there were several phone calls (outgoing, incoming, and missed) to Tate's number between 5:30 and

5:58 p.m. that day. At 5:33:05, Mr. Allen's phone received a message from Tate's phone number that stated: "805 [G]ulf Dr." Lieutenant Leblanc agreed the text messages indicated that two people contacted Mr. Allen to have "weed" delivered and there were no calls from defendant to Mr. Allen.

Linda Tran, an expert in "forensic firearms and analyst," created a firearm and toolmark analysis report. She reported that eight cartridge cases and one .40 copper jacket projectile she analyzed were fired from the Smith & Wesson .40 caliber semi-automatic pistol (the gun found in the victim's car), and two .45 auto-caliber fired cartridge cases and two copper jacketed bullets she analyzed were fired from the Springfield .45 auto caliber semi-automatic pistol (the gun located in the back yard of 810 Gulf Drive).

Timothy Scanlan testified as an expert in crime scene investigations and reconstruction. He stated that a bullet entrance hole in the vehicle showed a bullet traveled from the rear of the vehicle forward as it entered the vehicle. The bullet's path or trajectory indicated the car door was open or ajar at the time it was struck. Also, several projectiles originated from inside the vehicle at or near the driver's seat and went through the roof. It was not focused fire and such sporadic fire could be consistent with someone who was injured. Upon viewing a diagram he prepared, Mr. Scanlan explained the car had damage consistent with one bullet entrance hole and five areas of damage consistent with bullet exits that originated from the driver's side of the vehicle. He agreed the evidence was "consistent with two shots from the .45, pop, pop, a pause, and then this sporadic fire before the gun falls down."

Lieutenant Leblanc testified that in his opinion, the evidence indicated Tate fired the two shots from the murder weapon and nothing indicated Tate fired in self-defense. There was no evidence indicating defendant drew or fired his gun.

After deliberations, the jury found defendant guilty of second decree murder.

# HEARING AND RULING ON MOTION TO SUPPRESS

At the hearing on November 14, 2019 on defendant's motion to suppress the information extracted from the cell phones, Sergeant Gibbs stated he recovered the victim's cell phone from his vehicle, and four cell phones from the residence. He identified the search warrant for Mr. Allen and defendant's phones. The purpose of the warrant was to examine the phones' contents through a forensic extraction done by the JPSO forensic unit. The phones were stored in a secure location and manner so as to prevent any tampering of the phones prior to their extraction.

Sergeant Burke, an expert in mobile device forensics, was in charge of performing the cell phone extractions. He received six phones and the warrants for them on December 9, 2016. He completed the analysis of those phones on January 4, 2017. At that time, there were between 100 and 200 phones waiting to be analyzed by him. One phone could require up to eighteen hours to extract and interpret.

Once Sergeant Burke received the phones, he stored them in an evidence locker at the crime lab with controlled access. Nothing could be placed on or removed from those phones. Nothing on the phone vitiated or nullified the probable cause that previously existed for the search warrant. A new search warrant would contain the exact same probable cause affidavit with a different date, because nothing on the phones would change. Sergeant Burke stated it was physically impossible at that time to fully extract and analyze each phone within ten days of receiving it. It was his understanding that as long as he had the phone and the warrant within ten days of the warrant being obtained, he could test the phone at any time in the future. This was the understanding of the JPSO digital forensics unit and digital forensics units across the state, including the State Police.

On December 2, 2019, the judge denied defendant's motion to suppress the information extracted from the cell phones, finding that the 2019 amendment to Louisiana Code of Civil Procedure art. 163 was procedural in nature and not substantive, and thus applied retroactively in this case.

## ARGUMENTS OF THE PARTIES

On appeal, defendant argues the trial court erred in denying his motion to suppress evidence obtained pursuant to a search warrant not executed within ten days after its issuance, as required by Article 163. He contends the version of Article 163 in effect at the time of the offense should apply in this case, and because the searches of the phones were performed outside of the ten-day period permitted by Article 163(C), the evidence should have been excluded. He asserts the 2019 amended version of Article 163 does provide more time to extract a phone, but that version was not in effect at the time of the offense and when the warrant was obtained. Defendant argues the judge committed reversible error in finding the amendment was a procedural change and in applying the amended law retroactively. He also asserts no warrant requirement exceptions apply.[5]

The State argues the judge properly denied the motion to suppress. It contends defendant lacked standing to challenge the search of Mr. Allen's cell phone. The State contends preliminary searches of the phones were conducted within the ten-day period, and law enforcement was not required to complete the extraction within ten days. Alternatively, the State argues Article 163 should be viewed as interpretative or procedural and should be given retroactive effect. Even if the time period in Article 163 was not followed, suppression was not warranted under the exclusionary rule or inevitable discovery doctrine. Finally, the State argues any error would be harmless.

## LAW AND ANALYSIS

When evidence is seized pursuant to a search warrant, the defendant bears the burden of proof at a hearing on his motion to suppress that evidence. La. C.Cr.P. art. 703(D); *State v. McQuarter*, 19-594 (La. App. 5 Cir. 11/25/20), 305 So.3d 1055, 1073, *writ not considered*, 21-00295 (La. 8/6/21), 322 So.3d 247. The trial court is afforded great discretion in ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of discretion. *State v.*

---

[5] Even though numerous cell phones were seized and extracted, only the extractions of defendant's and Mr. Allen's cell phones were discussed at trial and raised on appeal.

*Isaac*, 17-87 (La. App. 5 Cir. 10/25/17), 229 So.3d 1030, 1038, *writ denied*, 17-2106 (La. 6/15/18), 257 So.3d 679.

As a general rule, searches and seizures must be conducted pursuant to a validly executed search warrant or arrest warrant. *State v. Every*, 19-40 (La. App. 5 Cir. 5/23/19), 274 So.3d 770, 777, *writ denied*, 19-1048 (La. 10/1/19), 280 So.3d 159. A search warrant may be issued only upon probable cause established to the satisfaction of a magistrate, by the affidavit of a credible person, particularly describing the person or place to be searched and the things to be seized. *State v. Richardson*, 18-717 (La. App. 5 Cir. 9/4/19), 279 So.3d 501, 511, *writ denied*, 19-1722 (La. 7/2/20), 297 So.3d 764; La. C.Cr.P. art. 162. Probable cause for the issuance of a search warrant exists when the facts and circumstances, within the affiant's knowledge and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief an offense has been committed and that evidence or contraband may be found at the place to be searched. *Every*, 274 So.3d at 780.

A search warrant must establish a probable continuing nexus between the place sought to be searched and the property sought to be seized. *Richardson*, *supra*. The facts establishing probable cause for the warrant must be contained within the four corners of the affidavit. *State v. Shiell*, 16-447 (La. App. 5 Cir. 12/7/16), 204 So.3d 1213, 1217, *writ denied*, 17-41 (La. 9/15/17), 225 So.3d 477. An affidavit supporting a search warrant is presumed to be valid; the defendant has the burden of proving the representations made in the affidavit are false. *Id*.

Concerning the search or extraction of cell phones, the United States Supreme Court has found the police generally may not, without a warrant, search digital information on a cell phone seized from an individual who has been arrested. *Riley v. California*, 573 U.S. 373, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014). In reaching this conclusion, the Court observed that modern cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley*, 573 U.S. at 385, 134 S.Ct. at 2484. However, given the

pervasiveness of cell phones, the Supreme Court also recognized that they "have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals." *Riley*, 573 U.S. at 401, 134 S.Ct. at 2493.

A warrant may become stale if facts and circumstances at the time of its execution show probable cause no longer exists. *Every*, *supra*. Thus, "staleness is only an issue when the passage of time makes it doubtful that the object sought in the warrant will be at the place where it was observed." *Id*.

Louisiana Code of Criminal Procedure article 163 sets forth the law regarding the proper procedure for the execution of search warrants. Effective between August 1, 2012 and July 31, 2019, Article 163 provided, in pertinent part:

* * *

C. Except as authorized by Article 163.1, a search warrant cannot be lawfully executed after the expiration of the tenth day after its issuance.

* * *

D. (2) Notwithstanding any other provision of law to the contrary, any examination or testing of the seized property may be conducted at any time before or during the pendency of any criminal proceeding in which the property may be used as evidence.

* * *

Effective between August 1, 2019 and July 31, 2022, Article 163 provided, in pertinent part:

* * *

C. Except as authorized by Article 163.1 or as otherwise provided in this Article, or as otherwise provided by law, a search warrant cannot be lawfully executed after the expiration of the tenth day after its issuance.

* * *

D. (2) Notwithstanding any other provision of law to the contrary, any examination or testing of the seized property may be conducted at any time before or during the pendency of any criminal proceeding in which the property may be used as evidence.

E. (1) Notwithstanding any other provision of law to the contrary, if a warrant is issued to search for and seize data or information contained in or on a … cellular telephone … the warrant is considered to have been executed within the time allowed in Paragraph C of this Article if the device was seized before the expiration of the time allowed, or if the device was in law enforcement custody at the time of the issuance of the warrant.

(2) Notwithstanding any other provision of law to the contrary, if a device described in Subparagraph (1) of this Paragraph was seized before the expiration of the time allowed in Paragraph C of this Article, or if the device was in law enforcement custody at the time of the issuance of the warrant, any data or information contained in or on the device may be recovered or extracted pursuant to the warrant at any time, and such recovery or extraction shall not be subject to the time limitation in Paragraph C of this Article.

* * *

In *State v. Folse*, 20-18 (La. App. 5 Cir. 4/7/20), 2020 WL 8770900 (unreported writ disposition), *writ denied*, 20-527 (La. 6/22/20), 297 So.3d 771, the defendant sought supervisory review of the judge's ruling which denied her motion to suppress evidence obtained from her cell phone. The defendant's phone had been seized pursuant to a warrant after her arrest in 2017. The judge denied the motion to suppress and found the amendments to Article 163(E) applied retroactively. This Court denied the writ application based on a plain reading of Article 163, clarified by the legislature in the 2019 amendments to the statute. This Court analogized the seizure of a phone for later review of the contents by a computer team to the removal of a defendant's documents for later review of the contents by investigators. Because the phone was seized and submitted for testing by the digital forensics unit within the time limitation of Article 163(C), the forensic examination was not required to be completed within ten days. It was thus not necessary to apply it retroactively in that case.

Similarly, in *State v. Sullivan*, 21-K-714 (La. App. 5 Cir. 1/21/22) (unpublished writ disposition), *writ denied*, 22-302 (La. 4/20/22), 336 So.3d 464, this Court addressed the staleness of a warrant for electronic devices. The relator in that case argued in part

that the warrants for the devices seized from his home were stale because they were over a year old before they were executed and the amendment to Article 163 applied prospectively only. This Court applied the 2012 version of Article 163(D)(2) in effect when the search warrants were signed. Because the examination of the seized devices was conducted "before or during the pendency of this criminal proceeding," pursuant to the plain wording of the article, the contents of the devices could be admitted into evidence at trial. Additionally, this Court concluded the amendment to Article 163 was interpretive, rather than substantive, and the interpretative legislation of Article 163(E) was to be applied retroactively. Pursuant to Article 163(E)(2), any information contained on the devices could be extracted and such extraction was not subject to the time limitation in Paragraph C.

In the present case, we initially conclude defendant lacks standing to challenge the search of Mr. Allen's cell phone. La. Const. art. I, § 5 extends standing to "[a]ny person adversely affected" by an invalid search or seizure to raise its illegality. However, the protection is not unqualified because La. Const. art. I, § 5 also presupposes "there must be an invasion of someone's rights to privacy before there can be an unreasonable search." *Every*, 274 So.3d at 783. In *Every*, this Court concluded the defendant had no possessory interest or reasonable expectation of privacy in the personal property of the victim. Even if the defendant was "adversely affected" by the search of the victim's cell phone, the victim, who had the privacy interest in the cell phone, was deceased. *Id*. at 783-84. As in *Every*, *supra*, in the present case, we conclude defendant has no reasonable expectation of privacy in the personal property of the deceased victim.

Additionally, we conclude the judge did not err in denying the motion to suppress based on a plain reading of Article 163 in effect at the time the warrants were issued. The 2012 version of Article 163(D)(2) in effect when the search warrants were signed provided: "Notwithstanding any other provision of law to the contrary, any examination or testing of the seized property may be conducted at any time before or during the pendency of any criminal proceeding in which the property may be used as evidence." Defendant's phone was

seized and submitted to testing by the digital forensics unit within the time limitation of Article 163(C), and thus, the extraction was not required to be completed within ten days. Because the examination of the seized devices was conducted before or during the pendency of the criminal proceeding, pursuant to the plain wording of the 2016 version of Article 163(D)(2), we conclude the contents of the phones were properly not suppressed.

Defendant's assignment of error is without merit.

## ERRORS PATENT REVIEW

The record was reviewed for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990).

On April 7, 2022, the judge sentenced defendant in several other cases. The judge then sentenced defendant in the instant matter to life imprisonment without the benefit of probation or suspension of sentence and ordered the sentences to run concurrently. The transcript indicates the judge ordered "all cases to run concurrent with one another." The minute entry states: "The Court ordered that the above sentence is to run concurrently with any and all other sentences currently serving time for." The Uniform Commitment Order ("UCO") states the sentence is concurrent with "any and all other sentences currently serving time for."

When there is a discrepancy between the minute entry or commitment and the transcript, the transcript prevails. *State v. Nellon*, 18-385 (La. App. 5 Cir. 12/19/18), 262 So.3d 441, 445 (citing *State v. Lynch*, 441 So.2d 732, 734 (La. 1983)). The transcript reflects the judge ordered the sentences imposed that day to run concurrently with one another. However, the sentencing minute entry and UCO appear to expand the judge's order to include any other cases beyond those imposed that day which defendant was serving time for.

The transcript also demonstrates the judge imposed the sentence without the benefit of probation or suspension of sentence. The UCO contains a column that states: "Amount of time to be served without benefit, if applicable (8)." That column is void of the amount

of time to be served without the benefit of probation or suspension of sentence.

In light of these discrepancies, we remand for correction of the UCO to specify which cases this sentence is to run concurrently with and to reflect the restriction of probation and suspension of sentence. Also, we direct the Clerk of Court for the 24th Judicial District Court to transmit the original of the corrected UCO to the institution to which defendant has been sentenced and to the Department of Corrections' legal department.

The sentencing minute entry also does not reflect that defendant's conviction of second degree murder is a crime of violence. Per La. C.Cr.P. art. 890.3(C), second degree murder "shall always be designated by the court in the minutes as a crime of violence." We order the correction of the minute entry to designate the conviction as a crime of violence. *See State v. Le*, 22-468 (La. App. 5 Cir. 8/9/23), 370 So.3d 162, *writ denied*, 23-1230 (La. 2/6/24), 378 So.3d 752. We also order the correction of the minute entry to address the previously discussed discrepancy regarding which sentences were imposed concurrently.

Finally, defendant was not advised of the prescriptive period within which to seek post-conviction relief pursuant to La. C.Cr.P. art. 930.8. Defendant is hereby informed no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922. *See State v. Taylor*, 20-215 (La. App. 5 Cir. 4/28/21), 347 So.3d 1008.

### DECREE

For the foregoing reasons, defendant's conviction and sentence are affirmed. The matter is remanded for correction of the Uniform Commitment Order and sentencing minute entry, as noted above.

**AFFIRMED; REMANDED FOR CORRECTION OF UNIFORM COMMITMENT ORDER AND SENTENCING MINUTE ENTRY**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MAY 15, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 23-KA-392

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HON. SCOTT U. SCHLEGEL (DISTRICT JUDGE)
HONORABLE JOHN E. LEBLANC (DISTRICT JUDGE)
ANDREA F. LONG (APPELLEE)          DARREN A. ALLEMAND (APPELLEE)          THOMAS J. BUTLER (APPELLEE)
BERTHA M. HILLMAN (APPELLANT)

**MAILED**
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053